Alejo **GONZALEZ**, # 224220, Petitioner,

v.

Thomas **PHILLIPS**, Warden,
Respondent.

No. CivA 98–CV–75600DT.

United States District Court,
E.D. Michigan,
Southern Division.

June 5, 2001.

Alejo Gonzalez, Jackson, MI, pro se, Rubina S. Mustafa, MI, State Appellate Defender Office, Detroit, MI, for Petitioner.

Janet Van Cleve, MI Dept. of Atty Gen., Lansing, MI, for Respondent.

### OPINION AND ORDER GRANTING EVIDENTIARY HEARING[1]

TARNOW, District Judge.

## I. Introduction

Petitioner, Alejo Gonzalez ("Gonzalez"), presently confined at the Charles Egeler

---

1. Staff Attorney Martin Cadwell provided quality research assistance.

Correctional Facility in Jackson, Michigan, has filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 through counsel alleging that he is confined in violation of his constitutional rights. In his application, Gonzalez challenges his conviction after a jury trial in the Genesee County Circuit Court of conspiracy to deliver over 650 grams of cocaine, M.C.L. 750 .157a, and delivery of over 650 grams of cocaine, M.C.L. 333.7401(2)(a)(i). Gonzalez was sentenced to two consecutive terms of life imprisonment for these crimes.

## II. Factual Background

The Michigan Court of Appeals summarized the evidence against Gonzalez as follows:

> The police surveillance team saw defendant transfer the package of drugs to its informant. The informant testified that defendant handed him the cocaine. Defendant's fingerprints were found on the package containing the cocaine.

*People v. Gonzalez,* Michigan Court of Appeals Docket No. 156916 at 2.

The informant was Karl Stewart. He had been arrested by federal agents for delivery of a kilogram of heroin. Stewart cooperated with the government in exchange for a non-binding prosecutorial recommendation of a reduced sentence. The reduction, if granted, would be from "10 to 12 years down to six and a half years." [2] Stewart met with Gonzalez's eventual co-defendants David Walters, Ernesto Galarza, and David Osborn to arrange a cocaine purchase. Walters offered to sell Stewart 18 ounces, or about half a kilogram (500 grams) for $15,000. Stewart insisted on buying a whole kilogram. Stewart testified that Walters said that in a few days Os-

born would meet Stewart and sell him a kilogram of cocaine for $ 27,600.

Stewart testified that he met Osborn at a Sears store parking lot on July 15, 1991. Stewart had $ 30,000 in a blue gym bag. Osborn told Stewart that he had to go to Pontiac, Michigan, to get the drugs and would meet him in a couple of hours. Osborn called Stewart and arranged to meet him at a Builder's Square store parking lot. About ten minutes after Stewart arrived at the meeting place, Osborn arrived. Stewart got into Osborn's car, a black Grand Prix. Police surveillance personnel were observing the scene. Osborn said that he still did not have the cocaine and drove towards the Builder's Square and picked up Galarza. Osborn drove a little farther and picked up Gonzalez.

Osborn then drove to a gas station where Gonzalez made a phone call from a pay phone. Soon afterwards, a brown car pulled up behind Osborn's car. Stewart gave Gonzalez the blue gym bag containing the money. Gonzalez took the bag full of money and walked to the brown car. Then he returned to Osborn's car with a plastic bag containing a package sealed in what appeared to be red wax. Gonzalez gave the plastic bag containing the red package to Stewart and left. Osborn drove with Stewart in his car and was intercepted by a large number of police. Osborn tried unsuccessfully to elude them. Osborn and Stewart were apprehended and the drugs, which Stewart had thrown from the car at Osborn's behest, were seized. Stewart further testified that Gonzalez had not been involved in any discussions with him arranging the transaction. Stewart testified that he was not sure, but thought that Gonzalez was wearing a black

**2.** Stewart testified that, in exchange for his cooperation, the prosecutor "would make a non-binding recommendation on [sic] the

judge that I would receive a departure from the guidelines which is 10 to 12 years down to six and a half years." Tr. Vol. I at 23.

sweatshirt that day. It was later established that the red package contained a substance weighing just under one kilogram containing a measurable amount of cocaine.

Osborn testified that he had been a co-defendant of Gonzalez and the others and had been charged with conspiracy to deliver and delivery of over 650 grams of cocaine. He made a bargain to plead guilty to the one lesser offense of delivery of between 225 and 649 grams of cocaine, an "offense that would carry a penalty of 20 to 30 years in prison." [3] Osborn testified that he drove to Builder's Square alone. Gonzalez, Galarza, and Sofia Garcia ("Garcia") drove there in a tan Oldsmobile. Osborn first picked up Stewart, then Galarza and Gonzalez. Osborn stated that Gonzalez left Osborn's car with the money Stewart had delivered. Galarza also left the car. Osborn said it was Galarza who brought the drugs to Osborn's car, not Gonzalez.

Sofia Garcia ("Garcia"), originally a co-defendant, testified that following her testimony at Gonzalez's trial, her charges would be reduced from one count of conspiracy to deliver over 650 grams of cocaine and one count of delivery of over 650 grams of cocaine to one count of delivery of between 225 and 649 grams of cocaine, "which carries 20 to 30 years in prison." [4] Garcia was Gonzalez's fiancee. She agreed to plead guilty and testify because she had a young daughter and wanted to avoid a life sentence. Garcia drove the brown Oldsmobile to the gas station where the cocaine transaction took place. Garcia testified that it was Galarza who took a container from the Oldsmobile and gave it to someone in Osborn's car. Gonzalez returned to the Oldsmobile with the blue gym bag. Garcia did not see its contents. Garcia heard Gonzalez and Galarza arguing, with Gonzalez saying that he had nothing to do with preparations to sell drugs to anyone named Stewart. Garcia said Gonzalez was wearing white clothes on the day of the incident.

Ernesto Galarza ("Galarza"), also originally a co-defendant charged with one count each of conspiracy to deliver and delivery of over 650 grams of cocaine, testified that he agreed to testify and plead guilty to one count of delivery of between 225 and 649 grams of cocaine "which carries a possible penalty of 20 to 30 years" in exchange for dismissal of the more serious charges.[5] Galarza testified that he and Gonzalez discussed the one kilogram cocaine sale to Stewart with Gonzalez and that Gonzalez provided the cocaine. Galarza denied carrying the cocaine to Stewart. Galarza said that Gonzalez was dressed in all white clothing on the day of the cocaine sale and arrests.

Michigan State Police fingerprint expert Robin Bratton testified that she examined the package containing the cocaine which was delivered to Stewart. The package was about 9 inches by 6 inches by an inch and a quarter and was wrapped over and

---

3. Osborn was actually sentenced to 17 to 30 years imprisonment. See Appendix C of Gonzalez's Application for Leave to Appeal in the Michigan Supreme Court.

4. Sofia Garcia actually received a sentence of 12 to 30 years for one count of conspiracy to deliver between 225 and 649 grams of cocaine. See Appendix C of Gonzalez's Application for Leave to Appeal in the Michigan Supreme Court.

5. According to Gonzalez's Application for Leave to Appeal in the Michigan Supreme Court, Ernesto Galarza actually received a sentence of 12 to 30 years. See Application at 42, n. 7. The copy of Appendix C to that application provided to this Court does not include a copy of Galarza's Judgment of Sentence. See Appendix C.

over again in red tape giving it a book-like shape. The package contained 988.3 grams of a white powder showing the presence of cocaine. Gonzalez's fingerprints were found on the red tape on the outside of the package.

Gonzalez's co-defendant David Walters testified on his own behalf that Stewart asked him to obtain a kilogram of cocaine for him, but he refused. Walters said he had purchased small amounts of cocaine from Stewart, but had never sold any. Walters denied having anything to do with planning or carrying out the sale of the kilogram of cocaine to Stewart. Walters testified that he thought Stewart believed he was a possible source of cocaine because he (Walters) knew Galarza. Walters was convicted of conspiracy to deliver and delivery of over 650 grams of cocaine and was sentenced to two consecutive life terms.

Gonzalez did not testify on his own behalf or call any other defense witnesses.

## III. Procedural History

Gonzalez was convicted by a jury of conspiracy to deliver over 650 grams of cocaine, M.C.L. 750.157a, and delivery of over 650 grams of cocaine, M.C.L. 333.7401(2)(a)(i). Gonzalez was sentenced to two consecutive life terms for these crimes. Gonzalez filed a direct appeal, raising the following issues:

I. Were defendant's rights to confrontation and due process violated, where the trial court precluded cross-examination of a key witness as to a possible source of bias?

II. Was the trial court's failure to provide defendant with an interpreter at trial reversible error, where defendant did not speak or understand English?

III. Did the trial court commit reversible error in unduly restricting voir dire?

IV. Was defense counsel ineffective in failing to move for appointment of an interpreter for defendant at trial, in failing to bring out the entire bargain for the accomplices' testimony and the fact that they all lied about it, and in failing to utilize defendant's testimony where there was no other support for his defense?

V. Was the trial court without statutory authority to order that the sentence for conspiracy to deliver a controlled substance run consecutively to the other sentence?

VI. Were mandatory minimum sentences of non-parolable life imprisonment for conspiracy and delivery of cocaine cruel and unusual punishment, at least as applied to defendant?

Gonzalez also filed a motion in the Michigan Court of Appeals to remand for a hearing on the matter of the trial court's failure to provide an interpreter at trial and ineffective assistance of counsel. On June 14, 1994, the Michigan Court of Appeals denied the motion to remand without prejudice in the following order:

The Court orders that the motion to remand is DENIED without prejudice to filing another motion to remand which sets forth in an affidavit how long the defendant has lived in the United States, the defendant's complete educational background and in what language he communicated with his trial attorney. In addition, appellate counsel shall contact trial counsel for defendant and ask counsel why a motion for an interpreter was not filed in the circuit court. That response by trial counsel shall be contained in the affidavit.

*People v. Gonzales,* Michigan Court of Appeals Docket No. 156916 (June 15, 1994).

Gonzalez refiled his motion to remand with an affidavit from appellate counsel F. Michael Schuck ("Schuck"). Attorney

Schuck stated that he spoke Spanish. Schuck's affidavit indicated that Gonzalez had lived in the United States about twelve years at the time of his trial. Gonzalez immigrated to the United States from Cuba in 1980. In the United States, Gonzalez lived primarily in Spanish-speaking areas where he did not have to speak English. Gonzalez's education, all in Spanish, consisted of high school and four years of college in Cuba, without graduating. Gonzalez stated that he spoke limited English and communicated with trial counsel in English, because trial counsel did not speak Spanish. Trial counsel told appellate counsel that he did not believe that Gonzalez needed an interpreter. Attorney Schuck stated that he personally interviewed Gonzalez twice and spoke to him on the phone several times and was convinced that Gonzalez "does not speak or understand sufficient English to understand testimony or argument at trial." Affidavit of F. Michael Schuck dated February 23, 1995, at 2. The affidavit also indicates that Charles Murphy, trial counsel for Gonzalez's co-defendant and fiancee Sophia Garcia, told Schuck that Gonzalez did not speak or understand English.[6]

Other affidavits in the record state that Gonzalez's English was not good, not up to par, and inadequate to allow him to understand what was happening at his trial. Gonzalez's Pre–Sentence Investigation Report, prepared in 1992, indicates that Gonzalez knows "some English," but "seems to have little grasp of the English language" and also states that he "has a desire to learn more English." A notarized letter from a prison instructor dated 12/2/95 states that, due to Gonzalez's limited

knowledge of English, he has only completed the "hands-on" or "practical training section" of a training course and further notes that Gonzalez's difficulties with the course material do not stem from a lack of effort, but from the fact that "the course and staff are not designed for inmates who do not read and speak fluent English."

On April 10, 1995, the Michigan Court of Appeals denied Gonzalez's motion to remand. Gonzalez's motion for a rehearing, supported by additional affidavits, was denied on June 30, 1995.

Gonzalez sought an interlocutory appeal of the denial of his motion to remand in the Michigan Supreme Court. Leave to appeal was denied on March 29, 1996. *People v. Gonzales*, 451 Mich. 855, 546 N.W.2d 258 (1996).

The Michigan Court of Appeals affirmed Gonzalez's convictions, but remanded for amendment of the sentences to run concurrently. *People v. Gonzales*, Michigan Court of Appeals Docket No. 156916 (November 15, 1996). Rehearing was denied on February 14, 1997.

Gonzalez and the prosecution sought leave to appeal in the Michigan Supreme Court. The Michigan Supreme Court reversed the Michigan Court of Appeals concerning Gonzalez's sentences and reinstated the consecutive sentences and denied Gonzalez's application for leave to appeal. *People v. Gonzalez*, 456 Mich. 866, 568 N.W.2d 683 (1997). Reconsideration was denied. J. Kelly concurring. *Ibid.*

Gonzalez has filed a petition for a writ of habeas corpus presenting the following issues:

---

6. An affidavit filed by Charles Murphy states that Gonzalez "spoke Spanish and some English" and that Murphy was not sure Gonzalez "understood the complexities of legal language." Affidavit of Charles Murphy. Appellate counsel Schuck filed an additional affidavit stating that "Mr. Charles Murphy toned down his own affidavit after stating that he did not want to hurt trial counsel." Affidavit of F. Michael Schuck dated May 1, 1995.

I. Was due process violated where the court precluded cross-examination of a key witness as to bias?

II. Was the court's failure to provide Petitioner with an interpreter at trial, where Petitioner did not speak or understand English, reversible error?

III. Was defense counsel ineffective in failing to move for appointment of an interpreter for Petitioner at trial, in failing to bring out the entire bargain for the accomplices' testimony and the fact that they all lied about it, and in failing to utilize Petitioner's testimony where there was no other support for his defense?

## IV. Analysis

### A. The AEDPA Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996) ("AEDPA" or "the Act"), govern this case because Gonzalez filed his habeas corpus petition after the effective date of the Act. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The AEDPA altered the standard of review that a federal court must use when reviewing applications for writs of habeas corpus.

As amended, 28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The United States Supreme Court has recently addressed the question of the proper interpretation of the amendments to the habeas corpus statute concerning entitlement to relief. The Supreme Court has stated that "[i]n sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The Supreme Court summarized the standard of review as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 120 S.Ct. at 1523.

"[A] federal habeas court making the 'unreasonable application' inquiry

should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 120 S.Ct. at 1521. The reviewing court should not inquire whether all reasonable jurists would agree that the state court's decision was reasonable or unreasonable. The reviewing court must be aware that "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 120 S.Ct. at 1522.

 Where constitutional trial error has been shown and the reviewing court concludes that the error had a substantial and injurious effect or influence in determining the jury's verdict, a state court ruling finding such error harmless beyond a reasonable doubt is outside the realm of plausible, credible outcomes and the petitioner is entitled to habeas relief. *Barker v. Yukins*, 199 F.3d 867 (6th Cir.1999), *cert. denied*, 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000). "[A] state court's application of federal law is unreasonable and a writ may issue only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible, credible outcomes." *Barker*, 199 F.3d at 871. "When a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch*, 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). "Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand." *Barker*, 199 F.3d at 873.

The federal court reviewing a habeas petition must apply the presumption of correctness to evidence-supported factual determinations made by a state court. *West v. Seabold*, 73 F.3d 81, 83 (6th Cir. 1996); *cert. den.* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996); *Lundy v.*

*Campbell*, 888 F.2d 467, 469 (6th Cir.1989), *cert. denied*, 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). This presumption may only be overcome by the presentation of clear and convincing evidence by the petitioner. 28 U.S.C. § 2254(e)(1).

**B. Failure of the trial court to provide Petitioner with an interpreter at trial**

Gonzalez's claim that failure to provide him an interpreter violated his right to due process and to meaningful presence at his trial may determine the outcome of this case. Furthermore, the material facts surrounding this issue also relate to his right to the effective assistance of counsel and his right of confrontation. Consequently, this Court shall not separately address Gonzalez's confrontation claim and ineffective assistance of counsel claim before resolving his interpreter claim.

Gonzalez contends that he was denied a fair trial by the trial court's failure to provide him with an interpreter at trial. Gonzalez maintains that his inability to understand and speak English and the absence of an interpreter at his trial violated his right to confrontation, his right to the effective assistance of counsel, his right to be mentally present at trial, and his due process right to fundamental fairness. Gonzalez further contends that any factual findings of the Michigan Court of Appeals to the effect that he spoke and understood English sufficiently well as to not need an interpreter are not entitled to the usual deference accorded state court factual findings in habeas proceedings. Gonzalez contends this is the case because 1) any such findings are clearly contradicted by the record and 2) the merits of the dispute regarding his ability to speak and understand English cannot be fairly said to have been resolved by the state proceedings, because the Michigan Court of Appeals

denied his motion to remand for an evidentiary hearing on this question. Further, the Michigan Court of Appeals is not a court of record. Gonzalez notes that an interpreter was provided for him at his preliminary examination where defense counsel told the court on the record that he (Gonzalez) needed an interpreter. Defense counsel also told the court at the preliminary exam that Gonzalez was "minimally" conversant in English.

Respondent replies that there was no record evidence before the trial court that should have alerted the court that Gonzalez did not speak English.[7] Respondent notes that Gonzalez had been living in the United States for about 12 years at the time of his trial. Based on Gonzalez's fairly lengthy residence in the United States, and the fact that an interpreter had been provided at his preliminary examination (showing that this could be done), Respondent contends that, if Gonzalez needed an interpreter, "in this case it is not unjust to expect Petitioner to have made a request." Respondent's Brief at 16.

Respondent does not argue that Gonzalez waived or procedurally defaulted any right he may have had to an interpreter by failing to request one, or failing to protest the absence of one before or during his trial. However, Respondent does cite *Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir.1989), wherein retired

Associate Supreme Court Justice Powell, writing for the court, noted: "Only if the defendant makes any difficulty with the interpreter known to the court can the judge take corrective measures. To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse."[8] Respondent also cites *United States v. Markarian*, 967 F.2d 1098, 1103 (6th Cir.1992), *cert. denied*, 507 U.S. 942, 113 S.Ct. 1344, 122 L.Ed.2d 726 (1993), where the court found that failure to appoint an interpreter *sua sponte* for a witness was not plain error where no one—not the witness (a prosecution witness testifying in exchange for leniency), defense counsel or the prosecution requested an interpreter. *See also, Rubio v. Estelle*, 689 F.2d 533, 535 (5th Cir.1982) (holding petitioner was not denied due process of law and right of confrontation by trial court's failure to *sua sponte* appoint an interpreter for petitioner, where it was clear that petitioner had sufficient command of English to request an interpreter, but did not do so).

Gonzalez relies primarily on *United States ex rel. Negron v. State of N.Y.*, 434 F.2d 386, 389 (2nd Cir.1970). In *Negron* the Second Circuit held that failure to *sua sponte* appoint an interpreter for an indigent twenty-three year old Puerto Rican immigrant charged with murder who neither spoke nor understood any English

---

**7.** A different judge presided over Gonzalez's preliminary examination in the 67th District Court for the County of Genesee than presided over his trial in the Seventh Judicial Circuit Court for the County of Genesee. Gonzalez was represented by different attorneys at these two proceedings.

**8.** In *Valladares* the defendant was provided with an interpreter. The interpreter, who was a Spanish-speaking attorney, provided the defendant with summaries of testimony, not a word-for-word translation of all trial

testimony. Thus, the issue in that case was whether *adequate* interpretation had been provided, not whether the court had failed to provide *any* interpreter where the defendant claimed to need one. Further, in *Valladares* the defendant was a naturalized United States citizen who had lived in the United States seventeen years and operated two businesses employing 40 to 60 people. The trial court found that the defendant had a working knowledge of English.

violated the petitioner's right of confrontation, right to consult with his lawyer with a reasonable degree of rational understanding, right to be meaningfully present at his own trial, and right to intelligently participate in his own defense, citing United States Supreme Court precedent in all of these areas. *Id.* at 389. The Second Circuit also found support for its ruling in United States Supreme Court competency law, e.g., *Pate v. Robinson,* 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The court found that an inability to speak and understand English rendered the defendant as unable to participate intelligently in his own defense as any mental disorder, yet this language-based "disability" was readily "curable" through provision of an interpreter.

At the beginning of Negron's trial, an interpreter provided Negron (who spoke only Spanish) with a translation of the trial court's instructions as to his right to make peremptory challenges to prospective jurors. Negron was not, however, provided with an interpreter to translate the testimony of adverse witnesses, almost all of whom testified in English, or to communicate with his lawyer who spoke no Spanish. The testimony of the two Spanish-speaking witnesses who testified for the state was simultaneously translated into English for the benefit of the court, the prosecution, and the jury. The federal district court found that it was obvious that the state trial court and the District Attorney were fully aware of Negron's language difficulties. In addition to holding that Negron's constitutional rights had been violated entitling him to a habeas relief, the Second Circuit stated that: "The least we can require is that a court, put on notice of a defendant's severe language difficulty, make unmistakably clear to him that he has a right to have a competent translator assist him, at state expense if need be,

throughout his trial." *Negron,* 434 F.2d at 390–91.

■ Gonzalez had made it known to the state at the preliminary examination that he needed an interpreter. Thus, Respondent's cases discussing the issue of whether or not there is a *sua sponte* requirement to appoint an interpreter are not applicable. Gonzalez's request for an interpreter at the preliminary examination was granted. That is consistent with due process and Michigan law. *See People v. Sepulveda,* 412 Mich. 889, 313 N.W.2d 283 (1981) (citing M.C.L.A. § 775.19a and stating that "[n]otwithstanding the failure of the defendant to request an interpreter, it was error to fail to appoint an interpreter where the record clearly shows that the defendant spoke no English whatsoever"). *See also, People v. Atsilis,* 60 Mich.App. 738, 231 N.W.2d 534 (1975) (whenever it appears that a defendant is incapable of understanding nature of, or of defending himself in, proceedings against him because he is unable to understand the English language, an interpreter should be appointed in his behalf; however, a trial judge is not under duty to affirmatively establish a defendant's proficiency in English when no evidence is presented that puts this issue in doubt); M.C.L.A. § 775.19a.

Gonzalez alleges that he was unable to understand English sufficiently well to intelligently participate in his defense and was thereby deprived of his right of confrontation and a fair trial. Gonzalez sought an evidentiary hearing on this matter, but the Michigan Court of Appeals denied his request. Respondent concedes that the United States Supreme Court would require that a non-English speaking defendant be provided an interpreter, if requested. Respondent contends, however, that the record shows that Gonzalez understood sufficiently well enough so that

"it is not unjust to expect Petitioner to have made a request" for an interpreter. Respondent's Brief at 16. Further, Respondent asserts that the Michigan Court of Appeals' ruling that the trial court did not abuse its discretion by failing to appoint an interpreter on its own motion was a reasonable application of federal law.

The Michigan Court of Appeals addressed Gonzalez's claim as follows:

> The record indicates that defendant had been in the United States since 1980 when he arrived from Cuba. Witnesses at the trial testified that defendant spoke Spanish during the incidents relating to the drug deal and defendant avers that he possessed a limited knowledge of English.
>
> However, there is nothing in the transcript which indicates that defendant requested the appointment of an interpreter or that he failed to comprehend the trial or pretrial proceedings.[9] Defendant's several exchanges with the trial court indicate that he was capable of understanding the trial judge and no concern was expressed on the part of any participant in the trial with regard to defendant's proficiency in English. Further, defendant demonstrated an ability to communicate with the trial judge in English at his sentencing. There is nothing which "appeared" to warrant the appointment of an interpreter by the trial court. That defendant spoke Spanish during the drug transactions merely evidences that he had retained knowledge of his native language or that Spanish was the preferred language of his cohorts. A trial court is not required affirmatively to establish a defendant's English proficiency, at least where the issue has not been introduced either by defendant or as a result of the trial court's encounters

with the defendant. *People v. Atsilis,* 60 Mich.App. 738, 739, 231 N.W.2d 534 (1975). As a result, no abuse of discretion occurred with respect to the court's failure to appoint an interpreter for defendant.

*People v. Gonzales,* Michigan Court of Appeals Docket No. 156916 at 3.

This Court finds this resolution troubling.

Gonzalez's case is distinguishable from *Negron* where it was undisputed that the defendant (who had only lived in the United States for a few months before his trial) did not speak or understand English. However, this Court is not persuaded in the present case that the trial court had not been sufficiently placed on notice of Gonzalez's difficulties with the English language to trigger a duty to inform him that he had a right to a competent interpreter, at state expense if necessary, if he wanted and needed one. Gonzalez had been living in the United States for about twelve years before his trial. However, this fact alone, if known to the judge, would not establish that Gonzalez spoke and understood English well enough to assist in the preparation and presentation of his defense without the services of an interpreter. Moreover, on September 10, 1991, the district judge appointed an interpreter for Gonzalez at his preliminary examination, and that judge, Judge Gerald D. Snodgrass of the 67th District Court for the County of Genesee stated on the record that "Mr. Gonzales needs an interpreter." This Court is not persuaded that the prosecutor and the trial judge of the circuit court of the same county should not be deemed to have constructive knowledge of this constitutionally significant fact stated on the record of the preliminary examination in the court below.

---

9. As noted, an interpreter was appointed for Gonzalez at the preliminary examination.

However, the actions of the trial judge and the holding of the Michigan Court of Appeals have some record support. On October 7, 1991, Gonzalez appeared without an interpreter at his arraignment before the trial judge. The court asked Gonzalez a number of questions including whether he received a copy of the document called the Information, whether he understood the two separate counts of Conspiracy to Deliver in Excess of 650 Grams of Cocaine and Delivery in Excess of 650 grams of Cocaine, whether he understood that each of these charges carried a mandatory life sentence, and whether he understood that he had a right to a jury trial; and the right to an attorney, including an attorney at public expense. Gonzalez replied "Yes" to all of these questions without once indicating in any way that he did not understand what he was being asked. Gonzalez's trial began about five months later before the same judge. Gonzalez's responses at his arraignment (which followed the preliminary ·examination where an interpreter was provided) provide some· support for Respondent's contention that he was sufficiently conversant in English to have requested an interpreter if he thought he needed one.

Respondent does not claim that there were any further exchanges between Gonzalez and the trial court before the trial. Various witnesses at trial testified that Gonzalez spoke Spanish and not English. Gonzalez's responses to questions at his sentencing are limited to an ungrammatical "yes, I do" reply to being asked "did you see" the pre-sentence report, and other "yes," "no," "uh-uh," responses, (once answering yes, then no, to the same question). This Court is not persuaded that these exchanges at sentencing provide substantial evidence from which to conclude that Gonzalez understood English well enough to protect his rights at trial, where

significantly more complicated and contested matters were being litigated.

This Court concludes that the factual record is inadequate to determine whether Gonzalez was denied his constitutional rights at trial due to the trial court's failure to appoint an interpreter, or to inform Gonzalez that he had a right to an interpreter at state expense if necessary. Furthermore, Gonzalez's claims of ineffective assistance of trial counsel also were not factually explored in state proceedings.

 Under the amended statute governing whether a federal habeas petitioner may obtain an evidentiary hearing in the federal district court on a claim for which the factual basis was inadequately developed in state court, the petitioner generally may not be granted a hearing where he has "failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). However, the "AEDPA and uniform case law interpreting it provide that if the habeas petitioner 'has diligently sought to develop the factual basis of a claim for habeas relief', but has been denied the opportunity to do so by the state court, § 2254(e)(2) will not preclude an evidentiary hearing in federal court." *Campbell v. Vaughn*, 209 F.3d 280, 285 (3rd Cir.2000) (quoting *Cardwell v. Greene*, 152 F.3d 331, 337 (4th Cir.1998)) (collecting court of appeals cases). *See also Jones v. Wood*, 114 F.3d 1002, 1014 (9th Cir.1997) (holding that "[w]here, as here, the state courts simply fail to conduct an evidentiary hearing, the AEDPA does not preclude a federal evidentiary hearing on otherwise exhausted habeas claims."). The United States Supreme Court has agreed, holding that a prisoner has not *failed* to develop the factual basis of a claim and an evidentiary hearing is not barred by § 2254(e)(2) where the petitioner was *unable* to develop the factual basis supporting his claim in state court

despite diligent efforts. *Williams v. Taylor*, 529 U.S. 420, 437, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Diligent efforts require, at minimum, that the petitioner seek an evidentiary hearing in state court in the manner prescribed by state law. *Id.* at 435, 120 S.Ct. 1479. Gonzalez filed a motion in the Michigan Court of Appeals to remand to the trial court for an evidentiary hearing on his claims. Gonzalez supported his motion with an affidavit, as set forth in M.C.R. 7.211(C)(1)(a)(ii). Therefore, this Court concludes that Gonzalez acted with sufficient diligence in state court to meet the standard set forth in 28 U.S.C. § 2254(e)(2).

■ Where it is the state's fault that the habeas factual record is incomplete, the federal district court may grant a hearing under the AEDPA. "In exercising that discretion, courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claims." *Campbell v. Vaughn*, 209 F.3d at 287. Gonzalez has alleged facts (supported by affidavits) which, if proven true, may entitle him to habeas relief. These factual issues are in dispute and the existing record provides an insufficient basis upon which to decide Gonzalez's claims. Therefore, this Court shall exercise its discretion to hold an evidentiary hearing on the factual issues critical to the resolution of Gonzalez's claims. *See, Abdur Rahman v. Bell*, 226 F.3d 696, 704–07 (6th Cir.2000) (decision whether to hold an evidentiary hearing to settle disputed issues of material fact is discretionary with the district court); *Barnes v. Elo*, 231 F.3d 1025, 1027–29 (6th Cir.2000) (remanding for an evidentiary hearing on the competency of trial counsel where the petitioner requested, and was denied, an evidentiary hearing in state court); and *Paprocki v. Foltz*, 869 F.2d 281, 286 (6th Cir.1989) (pre-AEDPA

habeas case stating that "if there are factual issues in dispute and an insufficient record upon which to resolve a legitimate claim of ineffective assistance of counsel, a district court must hold an evidentiary hearing"). *See also*, 28 U.S.C. § 2254, Rule 8 (noting that a federal habeas court shall determine whether an evidentiary hearing is required and that the court shall dispose of a habeas petition as justice requires when a hearing is not required).

This Court concludes that Gonzalez has alleged facts—namely his alleged inability to speak and understand English sufficiently well at the time of his trial to meaningfully participate in his defense, to be meaningfully present at his trial, and to protect his right of confrontation, right to counsel, and right to the effective assistance of counsel—which, if proven to be true, would have the potential to advance his habeas claim that the trial court denied his constitutional rights by improperly failing to appoint him an interpreter, or at least advise him of his right to an interpreter. The state courts refused to grant Gonzalez an evidentiary hearing on this matter, despite his diligent efforts to obtain such a hearing. Consequently, this Court concludes that Gonzalez should be granted an evidentiary hearing in federal district court on the issues of (1) whether he spoke and understood English adequately at the time of his trial to intelligently participate in his own defense and protect his right of confrontation without the services of a competent interpreter, (2) whether the trial judge deprived him of his constitutional rights to confrontation, meaningful presence at his trial and participation in his defense, and a fundamentally fair trial by failing to appoint him an interpreter, or advise him of his right to an interpreter, and (3) whether lack of an interpreter resulted in actual or constructive denial of counsel, and (4) whether trial counsel was ineffective.

Gonzalez's allegations of ineffective assistance of trial counsel were not factually explored in the state proceedings. Because they are sufficient on their face to state an ineffective assistance of counsel claim under the two-pronged standard of *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this is an additional, alternative reason to hold an evidentiary hearing in the present case. *See Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (factual inquiry by district court necessary on ineffective assistance claim in habeas petition to determine "prejudice," where defense counsel's performance in state proceeding was unreasonably deficient).

### IV. Conclusion

Based on the foregoing, this Court concludes that Gonzalez should be granted an evidentiary hearing in federal district court on the issues of (1) whether Gonzalez spoke and understood English adequately at the time of his trial to intelligently participate in his own defense and protect his right of confrontation without the services of a competent interpreter, (2) whether the trial judge deprived Gonzalez of his constitutional rights to confrontation, meaningful presence at his trial, meaningful participation in his defense, and a fundamentally fair trial by failing to appoint Gonzalez an interpreter, or advise him of his right to an interpreter, (3) whether lack of an interpreter resulted in actual or constructive denial of counsel, and (4) whether trial counsel was ineffective.

Accordingly, **IT IS HEREBY ORDERED** that an evidentiary hearing be conducted on the issues of (1) whether Gonzalez spoke and understood English adequately well at the time of his trial to intelligently participate in his own defense

and protect his right of confrontation without the services of a competent interpreter, (2) whether the trial judge deprived Gonzalez of his constitutional rights to meaningful presence at his trial, confrontation, meaningful participation in his defense, and a fundamentally fair trial by failing to appoint Gonzalez an interpreter, or advise him of his right to an interpreter, (3) whether lack of an interpreter resulted in actual or constructive denial of counsel, and (4) whether trial counsel was ineffective.